UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RAUL ESCARCEGA,

        Petitioner,

   v.

BEN CURRY, warden,

        Respondent.

_____/

No. C 06-3693 SI (pr)

**ORDER DENYING HABEAS PETITION**

**INTRODUCTION**

    Raul Escarcega, an inmate at the Correctional Training Facility in Soledad, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254.  This matter is now before the court for consideration of the merits of the petition.  For the reasons discussed below, the petition will be denied.

**BACKGROUND**

    Escarcega was convicted in Los Angeles County Superior Court of kidnapping for the purpose of robbery and was found to have used a weapon in the commission of the crime.  He also was found to have suffered three prior convictions for sentencing purposes: a 1982 conviction for assault with intent to commit rape, a 1981 voluntary manslaughter conviction, and a 1977 robbery conviction.  On March 16, 1984, he was sentenced to state prison for a term of life plus ten years.  Resp. Exh. 1.  His habeas petition does not challenge his conviction but instead challenges a June 3, 2004 decision of the Board of Prison Terms, now known as the Board of Parole Hearings ("BPH"), that found him not suitable for parole.   The 2004 hearing was Escarcega's fifth parole hearing, and was conducted at a time when he was 21 calendar years

1    into his life sentence.

2        The BPH identified the circumstances of the commitment offense, Escarcega's prior

3    criminality and unstable social history, as well as his unrealistic parole plans as the reasons for

4    the determination that he was not suitable for parole and would pose an unreasonable risk of

5    danger to society or a threat to public safety if released from prison.  Resp. Exh. 3 (reporter's

6    transcript of June 3, 2004 BPH hearing (hereinafter "RT")) at 53-55.  The specifics regarding

7    the crime and the circumstances supporting the finding of unsuitability are described in the

8    Discussion section later in this order.

9        Escarcega sought relief in the California courts. He filed a habeas petition in the Los

10   Angeles County Superior Court, where it was denied in a reasoned decision.  Resp. Exh. 4.

11   The California Court of Appeal denied his habeas petition in a short, conclusory order.  Resp.

12   Exh. 5.  The California Supreme Court summarily denied his habeas petition.  Resp. Exh. 6.

13       Escarcega then filed his federal petition for a writ of habeas corpus.  The court found

14   cognizable a due process claim that there was not sufficient evidence to support the decision.

15   Respondent filed an answer and Escarcega filed a traverse.  The matter is now ready for a

16   decision.  The court earlier indicated that it intended to wait for guidance from the anticipated

17   en banc decision in Hayward v. Marshall, 512 F.3d 536 (9th Cir.), reh'g en banc granted, 527

18   F.3d 797 (9th Cir. 2008), and further briefing thereafter.  Although much time has passed,

19   Hayward remains pending in the appellate court and it is unknown to this court when the

20   decision will be released.  The court will proceed to decide the merits of the petitions without

21   the benefit of the Hayward decision.

22

23                              **JURISDICTION AND VENUE**

24       This court has subject matter jurisdiction over this habeas action for relief under 28

25   U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged

26   action concerns the execution of the sentence of a prisoner housed at a prison in Monterey

27   County, within this judicial district.  28 U.S.C. §§ 84, 2241(d).

28

**EXHAUSTION**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claim asserted in the petition.

**STANDARD OF REVIEW**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000).   Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole. See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

**DISCUSSION**

A.    Due Process Requires That Some Evidence Support a Parole Denial

A California prisoner with a sentence of a term of life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability  proceedings.  See Sass, 461 F.3d at 1127-28; Board of Pardons v. Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1 (1979); Cal.

1   Penal Code § 3041(b).

2       A parole board's decision satisfies the requirements of due process if "some evidence"

3   supports the decision.  Sass, 461 F.3d at 1128-29 (adopting some evidence standard for

4   disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)).  "To

5   determine whether the some evidence standard is met 'does not require examination of the entire

6   record, independent assessment of the credibility of witnesses, or weighing of the evidence.

7   Instead, the relevant question is whether there is any evidence in the record that could support

8   the conclusion reached'" by the BPH.  Sass, 461 F.3d at 1128 (quoting Superintendent v. Hill,

9   472 U.S. at 455-56).  The "some evidence standard is minimal, and assures that 'the record is not

10  so devoid of evidence that the findings of the . . . board were without support or otherwise

11  arbitrary.'"  Id. at 1129 (quoting Superintendent v. Hill, 472 U.S. at 457).  The some evidence

12  standard of Superintendent v. Hill is clearly established law in the parole context for purposes

13  of § 2254(d).  Sass, 461 F.3d at 1129.  As a matter of state law, the decisionmaker's decision

14  must also satisfy the "some evidence" standard of review.  See In re Lawrence, 44 Cal. 4th 1181,

15  1191 (Cal. 2008) (state court "standard of review properly is characterized as whether 'some

16  evidence' supports the conclusion that the inmate is unsuitable for parole because he or she

17  currently is dangerous"); In re Rosenkrantz, 29 Cal. 4th 616, 676-77 (Cal. 2002).

18      A critical issue in parole denial cases concerns the parole authority's use of evidence

19  about the commitment offense that led to the conviction.  Three Ninth Circuit cases provide the

20  guideposts for applying the Superintendent v. Hill some evidence standard on this point: Biggs

21  v. Terhune, 334 F.3d 910 (9th Cir. 2003), Sass, 461 F.3d 1123, and Irons v. Carey, 505 F.3d 846

22  (9th Cir. 2007).[1]  Biggs explained that the value of the criminal offense fades over time as a

23  predictor of parole suitability:  "The Parole Board's decision is one of 'equity' and requires a

24  careful balancing and assessment of the factors considered. . . .  A continued reliance in the

25  future on an unchanging factor, the circumstance of the offense and conduct prior to

26

27      [1]En banc review is now pending in a fourth case regarding the some evidence standard,
    Hayward v. Marshall, 512 F.3d 536 (9th Cir.), reh'g en banc granted, 527 F.3d 797 (9th Cir.
28  2008).  The order granting en banc review states that the panel opinion is of no precedential
    value.

4

imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Biggs, 334 F.3d at 916-17. Biggs upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . ., should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole." Id. at 916.  Next came Sass, which criticized the Biggs statements as improper and beyond the scope of the dispute before the court:  "Under AEDPA it is not our function to speculate about how future parole hearings could proceed." Sass, 461 F.3d at 1129. Sass determined that the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the petitioner's pre-offense behavior in determining parole suitability.  See id. (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing). Sass also put to rest any idea from Biggs that the commitment crime and pre-offense behavior only support the initial denial of parole.  Irons determined that due process was not violated by the use of the commitment offense and pre-offense criminality to deny parole for a prisoner 16 years into his 17-to-life sentence.  Irons emphasized that all three cases (Irons, Sass and Biggs) in which the court had "held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence." Irons, 505 F.3d at 853.[2]  Interpreting this statement from Irons to suggest that the offense can only be relied on until the minimum number of years has been reached would suffer the same problem that Sass identified in Biggs: it is not the holding of the case.  The dicta in Biggs and Irons are speculative and do not determine when a denial of parole based solely upon the commitment offense or pre-offense behavior violates due process.  Neither logic nor Irons

---

[2]Interestingly, Irons was referring the actual number of years the inmate had been in prison and not the fictional number of years based on reductions for time credits.  In Irons, the inmate had been in custody 16 years on his 17-to-life sentence, having been convicted in 1985 and challenging a 2001 parole decision.

1   compels a decision that such reliance must cease when the prisoner reaches the minimum

2   number of years in his sentence, such as the fifteenth year of a 15-to-life sentence.

3          The upshot of these three cases is that the BPH can look at immutable events, such as the

4   nature of the conviction offense and pre-conviction criminality, to predict that the prisoner is not

5   currently suitable for parole even after the initial denial (Sass), but the weight to be attributed

6   to those immutable events should decrease over time as a predictor of future dangerousness as

7   the years pass and the prisoner demonstrates favorable behavior (Biggs and Irons).  Sass did not

8   dispute the principle that, other things being equal, a crime committed 50 years ago is less

9   probative of a prisoner's current dangerousness than one committed 10 years ago.  Not only does

10  the passage of time in prison count for something, exemplary behavior and rehabilitation in

11  prison count for something according to Biggs and Irons.  Superintendent v. Hill's standard

12  might be quite low, but it does require that the decision not be arbitrary, and reliance on only the

13  facts of the crime might eventually make for an arbitrary decision.[3]

14         What little guidance has come from the Supreme Court suggests that judicial review

15  should be extremely deferential to the original decision-maker in the parole context.  In addition

16  to the very low evidentiary standard that Superintendent v. Hill imposes, other Supreme Court

17  comments suggest that the judiciary should be quite mindful of the subjective and predictive

18  nature of a parole board's decision.  See Greenholtz, 442 U.S. at 13.  "No ideal, error-free way

19  to make parole-release decisions has been developed; the whole question has been and will

20  continue to be the subject of experimentation involving analysis of psychological factors

21  combined with fact evaluation guided by the practical experience of decisionmakers in

22

23  _____

24         [3]The California Supreme Court recently weighed in on the use of the commitment crime
    to deny parole in the companion cases of In re Lawrence, 44 Cal. 4th 1181 (Cal. 2008), and In
25  re Shaputis, 44 Cal. 4th 1241 (Cal. 2008).  The court explained that where "evidence of the
    inmate's rehabilitation and suitability for parole under the governing statutes and regulations is
26  overwhelming, the only evidence related to unsuitability is the gravity of the commitment
    offense, and that offense is both temporally remote and mitigated by circumstances indicating
27  the conduct is unlikely to recur, the immutable circumstance that the commitment offense
    involved aggravated conduct does not provide 'some evidence' inevitably supporting the ultimate
28  decision that the inmate remains a threat to public safety."  Lawrence, 44 Cal. 4th at 1191
    (emphasis in source).  Applying that rule, the court determined that there was not some evidence
    to deny parole in Lawrence but that there was some evidence to deny parole in Shaputis.

6

predicting future behavior.  Our system of federalism encourages this state experimentation." Id.; see also id. at 8.

Past criminal conduct is not some arbitrary factor like eye color that  has nothing to do with present dangerousness.  Recidivism concerns are genuine.  See Ewing v. California, 538 U.S. 11, 26 (2003) (O'Connor J.) (noting a report stating that over 60% of violent offenders were arrested again within three years of their release).  California's parole scheme does not offend due process by allowing the BPH to predict that an inmate presents a present danger based on a crime he committed many years ago.

Having determined that there is a due process right, and that some evidence is the evidentiary standard for judicial review, the next step is to look to state law because that sets the criteria to which the some evidence standard applies.  One must look to state law to answer the question, "'some evidence' of what?"

B.   State Law Standards For Parole For Kidnappers In California

California uses indeterminate life sentences for persons convicted of kidnapping for robbery.  See Cal. Penal Code § 209(b). California's parole scheme described below provides that a release date normally must be set unless various factors exist, but the "unless" qualifier is substantial.

A BPT panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates." Cal. Penal Code § 3041(a).  Significantly, that statute also provides that the panel "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal. Penal Code

§ 3041(b).

One of the implementing regulations, 15 Cal. Code Regs. § 2281, allows for consideration of a wide range of information in determining suitability, see § 2281(b), and lists circumstances tending to show suitability and circumstances tending to show unsuitability, § 2281(c) and (d).[4] The regulation also provides that "[t]he panel shall first determine whether a prisoner is suitable for release on parole.  Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2281(a).

The regulations contain a matrix of suggested base terms for several categories of crimes. See 15 Cal. Code Regs. § 2282.  For example, for kidnapping for robbery or ransom, the matrix of base terms ranges from the low of 8, 10, or 12 years to a high of 13, 15, or 17 years, depending on some of the facts of the crime.[5]  Some prisoners estimate their time to serve based only on the matrix.  However, going straight to the matrix to calculate the sentence puts the cart before the horse because it ignores critical language in the relevant statute and regulations that requires him first to be found suitable for parole.  The statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to

---

[4]The listed circumstances tending to show unsuitability for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and serious misconduct while in prison.  15 Cal. Code Regs. § 2281(c).  The listed circumstances tending to show suitability for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior.  15 Cal. Code Regs. § 2281(d).  The circumstances listed as tending to show unsuitability and suitability "are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." 15 Cal. Code Regs. § 2281(c) and (d).

[5]One axis of the matrix concerns the kind of harm done to the victim and the other axis of the matrix concerns the circumstances of the kidnapping.  The choices on the axis for the harm to the victim include no/minor harm, victim sexually or otherwise seriously assaulted, victim suffered major injuries, or victim died.  The choices on the axis for the circumstances of the kidnapping are minor movement, extensive movement, victim taken hostage, and intricate prior planning for the crime.  15 Cal. Code Regs. § 2282(c).

ensure term uniformity.  <u>In re Dannenberg</u>, 34 Cal. 4th 1061, 1070-71 (Cal. 2005).  Under state law, the matrix is not reached unless and until the prisoner is found suitable for parole.  <u>See</u> <u>id.</u> at 1070-71; 15 Cal. Code Regs. § 2282(a) ("[t]he panel shall set a base term for each life prisoner who is found suitable for parole").

The "Penal Code and corresponding regulations establish that the fundamental consideration in parole decisions is public safety . . . [T]he core determination of 'public safety under the statute and corresponding regulations involves an assessment of an inmate's <u>current</u> dangerousness.</u>"  <u>Lawrence</u>, 44 Cal. 4th at 1205 (emphasis in source).[6]

C.     <u>Some Evidence Supports The BPH's Decision In Escarcega's Case</u>

1.     <u>The BPH's Decision</u>

The BPH identified the circumstances of the commitment offense, Escarcega's prior criminality and unstable social history, as well as his unrealistic parole plans as the reasons for the determination that he was not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. RT 53-55.  The BPH also found that Escarcega needed "to continue in self-help to face, discuss, understand and cope with stress in a non-destructive manner."  RT 55.

<u>Commitment Offense</u>: The crime was described in a report the BPH had available to it at the hearing:

> [T]he prisoner, armed with a firearm, approached the victim from the driver's side of the vehicle.  His crime partner, Salazar, approached the vehicle on the passenger side.  The victim was ordered into the back seat of the car.  The victim was stopped at the intersection of Sunset and Figueroa in the City of Los Angeles.  This was about 2:30 in

---

[6]The California Supreme Court's determination in <u>Lawrence</u> that state law requires the parole authority to determine whether the inmate is unsuitable for parole because he currently is dangerous is binding in this federal habeas action.  <u>See Hicks v. Feiock</u>, 485 U.S. 624, 629-30 (1988).  However, <u>Lawrence</u> does not govern this court's analysis in every respect.  This court is not bound by the discussion in <u>Lawrence</u> (<u>see</u> footnote 4, <u>supra</u>) as to the evaluation of the commitment offense in determining whether the parole applicant currently is dangerous.  As to that point, <u>Lawrence</u> is persuasive authority, while the Ninth Circuit's holdings in <u>Sass</u>, <u>Biggs</u>, and <u>Irons</u> are binding authority.  Also, <u>Lawrence</u>'s determination that "some evidence" is the proper standard of judicial review, 44 Cal. 4th at 1211-12, does not bind this court because it is a state court decision and, in any event, was not determining the standard required by the federal constitution.

the morning. Then the prisoner drove the victim's vehicle with the crime partner in it and had the victim in the back seat down the street. The victim was robbed of several cassettes and a wallet containing 30 dollars. They also took some work shoes and tools, a jacket. Then the victim was told to leave. The victim drove away in his vehicle, went down the street, parked the vehicle, went to a telephone to call the police, and while he was there the prisoner and his crime partner drove by in another car. The victim hid. Then a citizen came to the aid of the victim. They went back to the car and then they noted the prisoner's license number of the car that he was in and they went back to the car. The police were already there. They gave him the license number and then another time when the prisoner and his crime partner drove by the crime scene and he was subsequently arrested.

RT 10-11. Escarcega denied his involvement in the kidnapping. See RT 11, 50.

The BPH determined that the kidnapping was "carried out in an especially violent and callous manner. The offense was carried out in a dispassionate and calculated manner." RT 53.

Prior criminality and unstable social history: The BPH also relied heavily on Escarcega's prior escalating criminality and unstable relationships in reaching its decision. The record before the BPH included the probation officer's report that listed Escarcega's extensive record of juvenile delinquency and criminal activity, starting with being picked up by police when he was just ten years old, when his mother called police because she thought he had been sniffing glue for several days and she was unable to control him. Resp. Exh. 2, p. 5. "He joined a juvenile gang at age 10, participated in gang activities. At age 10 began his abuse of alcohol and PCP. He admitted being a heavy drinker of alcohol. His adult record consists of two, an arrest for robbery and burglary, for which he was sent to the Youth Authority. When he was released he was arrested for a voluntary manslaughter and put back in the Youth Authority. He was released and then he was arrested for . . . assault with intent to commit rape. Then shortly after that he was involved in the commitment offense." RT 54.

There was ample support for the BPH's conclusion that Escarcega had a "record of violent and assaultive behavior" that was escalating. RT 54. In the burglary for which he was convicted in 1976, he "was armed with a shotgun and turned toward one of the officers. The officer fired once at the defendant, missing him, and the defendant dropped the gun and attempted to flee." Resp. Exh. 2, p. 7. As to the voluntary manslaughter conviction, he originally had been charged with murder for an incident in which he was "one of several [persons] who attacked, stomped, knifed and shot a victim in a gang retaliatory action outside of a local bar." Id at 8; see RT 11-

10

13. The assault with intent to commit rape was committed less than a week after he was released from prison after serving the voluntary manslaughter sentence. See RT 14. He was on probation for the assault crime when he committed the kidnapping that led to his life sentence.

His substance abuse history was significant. Escarcega was a heavy drinker with problems controlling his drinking when he was arrested for the kidnapping. He had been drinking since about age 10. RT 15. He also had experimented with marijuana, and used PCP. RT 15. He also had joined the Alpine street gang when he was about 11. He had, however, joined AA while in prison. RT 24-25.

Parole plans: The BPH determined that Escarcega "lacks realistic parole plans. He's not sure where he wants to live. The letter from his mother doesn't specifically indicate he can live with her. He has no job offer and he's not sure where he wants to work. He has sent out letters, but has not received responses and knows locations are quite a distance from where he anticipates he may live if he lives with his mother." RT 54-55.

These findings had support in the record. Escarcega planned to live with his mother, in the same area as the kidnapping took place, although her letter did not actually invite him to live with her. RT 36-37. He also had a letter from the Miracle House, but that did not offer housing and only explained what the program would be if he was accepted into it. RT 37. He had no written job offer, and several of the inquiries he had made were to employers far away from where he intended to live, and apparently would have involved impractical commutes. RT 39. The BPH did note that he had letters of support. RT 41-42.

Other information: In addition to the foregoing information, the BPH also reviewed more positive details in Escarcega's prison record. Escarcega had generally positive post-conviction factors, except that he had accrued a serious disciplinary history early on in his incarceration. He had received good work reviews, had obtained his GED, and had completed some vocational programs (although he lacked the necessary documentation of the completion of some programs). He had participated in AA in 1998-2004. He also had participated in various self-help groups and programs for personal betterment, as well as some special projects. Escarcega had a generally favorable psychological evaluation, RT 32. Escarcega stated that,

with age, he had learned to avoid situations with potential for trouble.  <u>See</u> RT 34.

Not all his post-conviction factors were positive, however.  Escarcega had received eight CDC-115 rule violation reports, although the most recent one was in December 1991.  The CDC-115s he had received were, according to one of the commissioners, were for serious offenses, such as being part of a conspiracy to steal by embezzlement from the inmate trust fund and the inmate welfare fund, RT 28, that was ultimately reduced to an administrative write-up, RT 29.  In November 1984, he was found in possession of a double-edge razor blade in his cell. RT 29-30.  In October 1984, an inmate-manufactured weapon was found in his cell; Escarcega contended the weapon was his cellmate's.  RT 30.  In 1981, he received a disciplinary write-up for being in possession of money.  RT 31.  He received five CDC-128 counseling memoranda for lesser infractions.  The most recent CDC-128 was in 2002 for an unexcused absence.  RT 31.

### 2.    The State Court Decision

The Los Angeles County Superior Court denied Escarcega's petition in a reasoned decision, finding some evidence to support the BPH's decision. Resp. Exh. 4.  The court rejected the BPH's finding about the kidnapping, but nonetheless upheld the BPH's ultimate determination of unsuitability.

> While certainly it appears that Petitioner planned to commit a robbery, the circumstances of the offense are not 'especially heinous, atrocious, or cruel,' such that that (sic) the offense could be described as 'dispassionate and calculated.' . . .  Thus, there is no evidence to support the Board's conclusion. [¶] However, the Board also found Petitioner unsuitable because of a prior unstable social history. . ., previous record of violence . . ., and because he lacks realistic parole plans, particularly related to work. . . .  There is 'some evidence' in the record to support each of those conclusions. [¶] The Court rejects Petitioner's argument that the Board failed to properly apply the considerations set forth in Penal Code § 3041. . . .  The record reflects the Board considered Petitioner's positive institutional gains but found they did not outweigh the factors for unsuitability and that Petitioner would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. . . . Thus, the Board did not abuse its discretion by denying Petitioner's parole.

Resp. Exh. 4, ¶. 1-2 (citations omitted).

12

1          3.      Analysis Of Federal Claim

2          The Los Angeles County Superior Court correctly identified the "some evidence"

3    standard as the applicable standard for judicial review, as evidenced by its citation to In re

4    Rosenkrantz, 29 Cal. 4th 616 (Cal. 2002), which had cited and adopted the Superintendent v.

5    Hill some evidence standard as the proper standard for judicial review of evidentiary sufficiency

6    for administrative  cases.  See Rosenkrantz, 29 Cal. 4th at 665-67.  Because the Los Angeles

7    County Superior Court's decision is the last reasoned decision, that is the decision to which §

8    2254(d) applies.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423

9    F.3d 1085, 1091-92 (9th Cir. 2005).  The state court did not unreasonably apply Superintendent

10   v. Hill.

11          The superior court's determination that the kidnapping was not "especially heinous,

12   atrocious or cruel" does not mean that the kidnapping has no weight in the parole suitability

13   calculation, but instead means that it alone would not support denial of parole at this point in

14   Escarcega's sentence.  Here, as the superior court noted, there were other factors supporting the

15   determination that Escarcega was not suitable for parole.  There was his unstable social history,

16   i.e., membership in a gang, substance abuse and extensive juvenile delinquency.  There was his

17   history of violence, that included a robbery, an involuntary manslaughter, and an assault with

18   attempt to commit rape.  And there was his lack of realistic parole plans in that he had not firmed

19   up his housing, had not lined up a job, and was looking for work at locations that would have

20   involved an unreasonable commute from his intended area of residence.

21          Escarcega appears to argue in his traverse that he was a juvenile when he committed the

22   kidnapping.  See Traverse, ¶. 19-21.  The probation officer's report states that he was born in

23   1958, which would have made him about 24 years old when the crime was committed.  His

24   argument about adolescent misbehavior does not fit his facts.  Some of his criminal activity did

25   occur when he was a juvenile, but it continued into adulthood and worsened as he grew older.

26   Thus, his is a particularly inappropriate case in which to view the crime as some sort of youthful

27   indiscretion.

28          Bearing in mind that the court's chore is to consider not whether some evidence supports

13

the reasons, but whether some evidence supports the conclusion that his release unreasonably endangers public safety, this court concludes that there was some evidence to support the BPH's conclusion that Escarcega's release would pose an unreasonable risk of danger to society if released from prison in 2004, some 21 years into his life sentence. The Los Angeles County Superior Court's rejection of Escarcega's insufficient evidence claim was not contrary to or an unreasonable application of the <u>Superintendent v. Hill</u> some evidence standard. Escarcega is not entitled to the writ.

**CONCLUSION**

For the foregoing reasons, the petition is denied. The clerk shall close the file.

IT IS SO ORDERED.

DATED: March 9, 2010

_____
SUSAN ILLSTON
United States District Judge

14